## The First Parish in Shrewsbury *versus* Daniel Smith.

By a vote of the proprietors of a township, a lot of land was appropriated for the purpose of erecting a meeting-house thereon. In 1727, after the erection of the meeting-house on the land, the town was incorporated and assumed the charge of its parochial affairs. The land around the meeting-house, was called " the common " or the " meeting-house land," was always open, and was intersected by several highways and other ways; it was also used as a site for horse-sheds and for all the ordinary purposes incident to a place of worship, and as a training-field. The town meetings had been held at the meeting-house. In 1754 and 1763, the proprietors voted to sell portions of the " meeting-house land," and they had also at different times exercised other acts of ownership over portions of this land. It was *held*, that the first parish, which was the successor of the town in its parochial capacity, might maintain trespass against a stranger who had ploughed up a portion of the land, which was used for purposes incidental to a place of worship.

*It seems*, that the vote of the proprietors, and the actual erection of the meeting-house, gave an actual possession of the land to the parish, which was sufficient to enable them to maintain trespass against a stranger.

THIS was trespass *quare clausum*, for ploughing up a large part of the land, called " the common," in Shrewsbury, on which the plaintiffs' meeting-house stands. The defendant claimed to have entered under a right in him, as a proprietor, to lay out the land.

The parties stated a case.

On November 2, 1717, the general court, on the petition of John Brigham and thirty others, granted the township of Shrewsbury, to be laid out as a town, and appointed a committee, with power " to grant and lay out the whole of the lands to such persons as they, in their wisdom, should think most likely to advance the settlement of the place," " provided they [the committee] have there at least forty families settled there, with an orthodox minister, within the space of three years, and that a lot and other accommodations as large and convenient as may be the place will admit of, in the judgment of the committee, be laid out to the first settled minister, also a lot for the ministry, and another for the use of the school." The committee proceeded to execute the duties assigned to them, and drew up their regulations, in which they declare, that, " pursuant to the power and the directions to them given in and by said order of the general court, having

due regard to the savings and exceptions therein made, they have granted to the several petitioners and farmers, whose names are under-written, and their heirs for ever, the several house lots," &c.

On October 27, 1719, the proprietors voted, " that the place for the meeting-house be on Rocky plain near the pines," and " if the said spot could not be obtained on reasonable terms, that then the meeting-house be set on Meeting-house hill." On May 20, 1721, the proprietors granted to William Taylor five acres and twenty-four rods of land, which is described in the records of the proprietors. Subjoined to this description is the following statement : " This abovementioned land was granted to the said William Taylor for satisfaction for fifteen acres of land, which he the said William Taylor has aliened to the proprietors of Shrewsbury, for to build a meeting-house upon." Taylor, in his deed to the proprietors of Shrewsbury, of fifteen acres of land called Rocky plain, " reserves to himself, his heirs, &c., an equal privilege in the aforesaid fifteen acres of land, with any one single proprietor."

On April 13, 1720, the society, at a meeting under a warrant for a " proprietors' meeting," voted, " that a committee of five men be chosen to manage about the meeting-house." On June 20, 1720, at an adjournment of the previous meeting, it was voted, that the propriety was willing to go forward with their meeting-house as fast as they could from that time ; that the sum of £210 be levied upon the proprietors of the house lots in the town called Shrewsbury, for the purpose of building the meeting-house, and that the committee previously chosen, be empowered to contract for the 'building of the meeting-house, and to procure the land for the same. On May 15, 1723, the following entry is made in the records: " The Reverend Job Cushing was chosen by said town, for their minister, by a full vote."

On the 14th of December, 1727, the town was incorpo-rated, and on the 29th was organized in its municipal character, when it took charge of the affairs of the society, making all grants of money for preaching, and for the repairing and finishing of the meeting-house, and continued to do so until 1743, when a second parish was incorporated in the territory

now called Boylston. The society before mentioned thereupon became the first parish, and was then organized as a precinct.* In 1786, the second parish was incorporated as a town by the name of Boylston ; and thereupon, the parochial affairs of the first parish again fell into the hands of the town of Shrewsbury, the parochial organization being discontinued, and were managed by the town until 1821, when the precinct was again organized, and has so continued ever since.

In pursuance of the votes of the proprietors in 1720, a meeting-house was erected on the tract of fifteen acres, in which the society worshipped until 1766, when they erected a new meeting-house, on the same tract of land, between the old one and the principal highway leading through Shrewsbury. The old meeting-house was then taken down by the society and appropriated to their use, and they have ever since continued to worship in the new meeting-house. The land around the meeting-houses, which has always been open and unfenced, is intersected by several ways leading to the burying-ground, &c., and by two highways, and is known by the name of the common, or the meeting-house land. The society have always used this open space for sites for horse-sheds, and for all the ordinary purposes incident to a place of worship. The town meetings and other public meetings have been generally held at the meeting-house, and the open space has been used as a training-field.

The burying-ground is on the same tract, in relation to which the town from 1730 to 1738, passed votes, providing for clearing the land and fencing it. In 1743, the society, being organized as a parish, appeared, by their records, to have taken charge of the burying-ground, and from that time until 1786, numerous votes were passed by them, providing for repairing the fence, clearing away the brush, &c.

In 1754 and 1763, the proprietors voted to let certain persons have portions of the " meeting-house land." In 1766, they voted to choose a committee to look up the bounds of the meeting-house land, and to report how much thereof it was proper to sell ; and the committee reported that it was proper to sell several portions of it.

In 1773, the proprietors voted to give the first precinct,

First Par.
Shrewsbury
v.
Smith.

liberty to move out the wall of the burying-ground. In 1790, the two following articles were inserted in the warrant for a proprietors' meeting ; 1. To see if they would appropriate six rods in width, of land in front of the burying-yard, to enlarge it ; 2. To see if they would give the town liberty to cut the brush which grew around the yard. At the meeting the proprietors voted to allow the inhabitants of the town of Shrewsbury to clear up the brush, &c., at the west end of the burying-ground, as far as the west line, and also the birches and poplars on the north side. , No other vote was passed on the subject. In May 1795, they " voted to sell the wood on the proprietors' land near the burying-ground," and chose Jonathan Bush, Job Cushing and Joab Hapgood, a committee for this purpose. Two of this committee were members of the parish, and the land was sold to another member. In 1791, the proprietors granted to the town of Shrewsbury two acres and ninety-six rods of the meeting-house land, for a burying-ground ; this included the old burying-ground.

In 1802, the town voted to accept the plan of the burying-ground, as laid out and exhibited by the committee on that subject. The article in the warrant for the meeting, under which this vote was passed, was as follows ; " To see if the town are disposed to lay out that ground which was last appropriated for a burying-place, into such squares or plots as shall be thought best calculated to accommodate individuals and make a saving of the same in future."

The site of the old meeting-house and the ways leading to the new meeting-house, the sheds and the burying-ground, were ploughed up by the defendant.

Oct. 8t'
1832.

*Davis* and *Washburn* for the plaintiffs.

*Newton* and *Lincoln*, for the defendant, cited to the point, that if the parish entered into possession by license from the proprietors, they had acquired no right to it, *Commonwealth* v. *Dudley*, 10 Mass. R. 403 ; *Porter* v. *Hill*, 9 Mass. R. 34 ; that a corporation cannot acquire a title by a disseisin committed by itself, *Weston* v. *Hunt*, 2 Mass. R. 502 ; Com Dig. *Seisin*, F 4 ; and that a concurrent possession of the parish cannot be considered an ouster of the proprietors, *Norcross* v. *Widgery*, 2 Mass. R. 506.

SHAW C. J. delivered the opinion of the Court. There is great difficulty in applying the strict rules of common law conveyancing, to the early acts and votes of proprietors, towns and parishes, in the colony and province of Massachusetts, without danger of producing some confusion of rights ; and the fact probably was, that towns, parishes and proprietors, often consisted so nearly of the same individuals, that a grant or appropriation of one of these bodies to another was little more than an appropriation by themselves in one capacity, to the use of themselves in another ; from which it probably followed, that less attention was paid to such acts, than if they had been acts of alienation to strangers.

It is a settled rule of law, that any actual possession of real estate is sufficient to enable the party in possession to maintain *quare clausum fregit* against a stranger ; and every one must be deemed a stranger, who can show no title and no elder possession. We are satisfied upon the evidence, that the parish have had the actual possession of the lot of land on which the meeting-house stands, together with such part of the land as has been used with it, for horse-sheds, and other purposes, and which may from these and similar circumstances, be reasonably presumed to have been annexed to and become parcel of it.

There is much ground to contend, that the early vote of the proprietors to appropriate the fifteen acres obtained by exchange from Taylor, to build a meeting-house upon, may be deemed an appropriation and annexation of the same, as appurtenant to the meeting-house, until resumed by the proprietors, if the proprietors had a right to resume it, although the subsequent acts of alienation of some parts of the fifteen acres, would seem to show that they did not consider this appropriation of the whole fifteen acres, as irrevocable. . But such vote, we think, with an actual erection of a meeting-house upon a part of the land, gives an actual possession to the parish, sufficient to enable them to maintain trespass against a stranger. But without going to this extent, it seems unquestionable, that so much of the land as has been used for purposes connected with the meeting-house, as a place of public worship, must be deemed to be in possession of the plaintiffs ; and without giving

any opinion as to the respective rights of the proprietors and the parish, or the whole effect of their vote, we are of opinion, that a part at least of the land ploughed by the defendant was thus occupied by the plaintiff parish, and that the defendant, being a mere stranger, violated their right of possession, and became liable to this action.

The general principle, on which this case is decided, appears to us to be highly reasonable in itself and well supported by authorities.

In a recent case, trespass was brought by one who held glebe land, under a lease made by a rector, which was void by statute, and it was ruled at *nisi prius*, that the plaintiff could not recover. The argument at the bar was, that possession is deemed *primâ facie* evidence of title ; but where, as in that case, it appeared that the plaintiff held under a void lease, such presumption could not arise, and therefore that possessior could not avail. But the court decided otherwise, and held that the plaintiff's possession was sufficient to enable him to maintain trespass against a wrong doer. *Graham* v. *Peat*, 1 East, 244.

In a still later case it was held, that mere prior occupancy, however recent, is *primâ facie* evidence of title, upon which the occupier may recover as plaintiff, or defend his possession, against all the world except him who has and can prove an older or better title. *Catteris* v. *Cowper*, 4 Taunt. 546.

This principle appears most reasonable and just. It is very clear, that a mere stranger cannot question the right of one in possession, or put him upon the proof or disclosure of his title. Nothing is more familiar than the rule, that where one brings an action against another, the plaintiff must prove a title or be nonsuited ; the defendant is not to be called on to show his title. And there seems to be no reason why a stranger should be placed in a better situation, by taking the matter into his own hands, ploughing land, taking crops, or otherwise interfering with the right of the party in possession. Such a proceeding would be as contrary to sound policy as to legal principles. There are many cases, where acts have been done, intended to constitute a good and valid title, where grants have

been made, and titles transferred, but where, through negligence, ignorance or mistake, especially where corporations, public bodies, and official agents are concerned, such titles cannot be legally proved. Upon a close investigation, a flaw in the title would be discovered. If a lawful owner in whom the legal title remains, chooses to interfere and set up his legal claims, the law, in consistency with its own rules in regard to the transmission of title, may be compelled to admit his claim. But if such owner, upon considerations of propriety, equity and conscience, chooses to acquiesce, and permit the party in possession to retain that possession, notwithstanding any defect of title, by what rule of law, of equity or sound policy, can a mere stranger be allowed to interfere and by his own act violate the actual and peaceable possession of another, and thereby compel him to disclose a title, in the validity or invalidity of which such stranger has no interest ?

*Defendant defaulted.*